David M. deRubertis, State Bar No. 208709
Alyssa K. Schabloski, State Bar No. 258876
**The deRubertis Law Firm**, APC
4219 Coldwater Canyon Avenue
Studio City, California  91604
Telephone: (818) 761-2322
Facsimile:  (818) 761-2323
E-mail: David@deRubertisLaw.com
E-mail: Alyssa@deRubertisLaw.com

David P. Strauss, State Bar No. 96874
**Law Office of David P. Strauss**
185 West F Street, Suite 430
San Diego, California 92101
Telephone: (619) 237-5300
Facsimile:  (619) 237-5311
E-mail: ds@dstrausslaw.com

Terry J. Chapko, State Bar No. 178807
**The Law Office of Terry J. Chapko**
120 C. Avenue, Suite 120
Coronado, California  92118
Telephone: (619) 522-2100
Facsimile:  (619) 522-2104
E-mail: tchapko@chapkolaw.com

Attorneys for Plaintiff
Mark G. Gefrom

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK G. GEFROM, an individual, | Case No.:  **'15CV2079 JM   JLB** |
| Plaintiff, | |
| v. | **COMPLAINT FOR:** |
| | (1) Violation of Family & Medical Leave Act (29 U.S.C. §2615); and |
| PACIFIC BELL TELEPHONE COMPANY, a California Corporation, doing business as AT&T COMMUNICATIONS OF CALIFORNIA, INC.; and DOES 1 through 50, inclusive; | (2) Wrongful Termination in Violation of Public Policy. |
| | **JURY TRIAL DEMAND** |
| Defendants. | |

1   Plaintiff, MARK G. GEFROM, hereby alleges against Defendants PACIFIC

2   BELL TELEPHONE COMPANY, a CALIFORNIA CORPORATION, doing

3   business as AT&T COMMUNICATIONS OF CALIFORNIA, INC.; and DOES 1

4   through 50, inclusive, as follows:

5

6   **GENERAL ALLEGATIONS**

7   1.      The true names, identities, or capacities whether individual, corporate,

8   associate, or otherwise, of Defendants DOES 1 through 50, inclusive, are unknown

9   to the Plaintiff, who therefore sues said Defendants by such fictitious names.  When

10  the true names, identities or capacities of such fictitiously designated Defendants

11  are ascertained, Plaintiff will ask leave of this Court to amend this Complaint and to

12  insert said true names, identities, and capacities, together with the proper charging

13  allegations.

14  2.      Plaintiff is informed and believes and thereon alleges that each of the

15  Defendants sued herein as a DOE is responsible in some manner and liable herein

16  for negligent, wanton, reckless, and tortious conduct, strict liability, and by such

17  wrongful conduct, proximately caused the Plaintiff's injuries and damages.

18  3.      At all times mentioned herein before his termination, Plaintiff was a

19  resident of the County of San Diego, State of California.  Thereafter, following his

20  termination, Plaintiff became a resident of the State of Utah.

21  4.      Defendants PACIFIC BELL TELEPHONE COMPANY, a

22  CALIFORNIA CORPORATION, doing business as AT&T COMMUNICATIONS

23  OF CALIFORNIA, INC.; and DOES 1 through 20 inclusive, were corporations,

24  associations, partnerships, joint ventures, or other business entities who at all times

25  herein mentioned conducted business in the State of California and throughout the

26  County of San Diego.  Upon information and belief, said Defendants, through their

27  agents or employees, made unlawful employment decisions relating to Plaintiff

28  within the County of San Diego, including on Trade Street in San Diego, California

92121.  Hereafter, Defendants PACIFIC BELL TELEPHONE COMPANY, a CALIFORNIA CORPORATION, doing business as AT&T COMMUNICATIONS OF CALIFORNIA, INC.; and DOES 1 through 20 inclusive may be referred to collectively as "Defendant AT&T."

5.      Defendants DOES 21 through 50, were individuals who were the agents, employees, members, volunteers, servants, partners, representatives, independent contractors, joint venturers, or other participants with or of Defendants PACIFIC BELL TELEPHONE COMPANY, a CALIFORNIA CORPORATION, doing business as AT&T COMMUNICATIONS OF CALIFORNIA, INC.; and DOES 1 through 20 inclusive, and in doing the things hereinafter mentioned, were acting within the course and scope of said agency, employment, membership, or other relationship with said Defendants.  At all times herein mentioned, Defendants DOES 21 through 35 were employees of Defendants  PACIFIC BELL TELEPHONE COMPANY, a CALIFORNIA CORPORATION, doing business as AT&T COMMUNICATIONS OF CALIFORNIA, INC.; and DOES 1 through 20 inclusive, who held supervisory positions within the company.

6.      At all times herein mentioned, Defendants (whether or not specifically identified or designated herein as a DOE Defendant), and each of them, were agents, employees, servants, partners, independent contractors, joint venturers, and/or participants with all other Defendants, and with each other, and in doing the things hereinafter mentioned, were agents, employees, servants, partners, and joint venturers and/or acted with the consent and permission of the co-Defendants, and each of them.

7.      Plaintiff names those unidentified Defendants as DOE Defendants because Plaintiff is ignorant of the true identity and facts attaching liability to all persons or entities responsible for Plaintiff's harm.  For that reason, Plaintiff names all of the said DOE Defendants along with the named Defendants and asks that the Court determine the liability of each and all of them in this action and to what

1  extent and what responsibility falls upon each of said Defendants, and that the

2  Court award judgment to Plaintiff as against such or all Defendants, either jointly or

3  separately, as may be found liable.

4

5  **FACTUAL ALLEGATIONS**

6  **A.    Defendant AT&T's longstanding history of targeting and discriminating**
   **against those who take FMLA leave or require disability-based**
7  **accommodations.**

8         **1.    2002: Defendant AT&T's predecessor entity SBC**
               **Communications, Inc. lobbies Congress to reduce FMLA**
9             **protections to employees.**

10        8.      In or about November 2005, after approval by the Federal

11  Communications Commission, SBC Communications, Inc. merged with Defendant

12  AT&T.  Following the merger, SBC Communications, Inc. adopted AT&T, Inc. as

13  its name.  Thus, SBC Communications, Inc. (hereafter, SBC) is a predecessor entity

14  of Defendant AT&T.

15        9.      In or about May 2002, Defendant AT&T, through its predecessor

16  entity SBC, lobbied Congress to rollback employee protections under the Family

17  and Medical Leave Act (FMLA) arguing that compliance with the FMLA was too

18  costly to the company.  Specifically, Roxanne Scott (SBC's then-Associate Director

19  of Federal Relations) urged the federal government's Office of Management and

20  Budget to rollback employee protections under the FMLA because "SBC believes

21  that the FMLA's original intent has been lost, and as a result the Act is being

22  implemented in a way that is pitting the needs of business against the needs of the

23  family."  Through Scott's letter, SBC tried to persuade the federal government that

24  the FMLA, "as interpreted by the Department of Labor (DOL), has presented an

25  obstacle for employers in the form of cumbersome administration, broad

26  interpretation, and an often diminished workforce leading to loss in productivity."

27        10.     According to Scott's letter, "[i]n 2001 alone SBC processed 152,157

28  requests for FMLA time" and that "[t]he processing of 150,000 plus cases a year is

**COMPLAINT**

not only a gargantuan administrative task, but also a costly one."  SBC lamented through Scott's letter that:

> ● SBC "required a staff of 21 case managers and five full-time administrative assistants," in addition to substantial time from local management or supervisors, to track and evaluate FMLA requests;
>
> ● SBC's annual costs "for the company's [FMLA] processing unit alone are over $2,000,000 per year";
>
> ● In 2001, SBC approved approximately 1.8 million hours of FMLA time, which "equates to approximately 228,655 lost work days" that "cost the company approximately $40 million in lost salary for 2001"; and
>
> ● In addition to the economic cost, FMLA time brings "other 'costs' that are difficult to measure that take a toll on a company's well being – the impact that a reduced workforce has on morale in the workplace, increased time and effort necessary for management of unscheduled absences (as well as other 'soft' costs), and the cost of lost productivity are not captured in the lost salary figure."

11.     SBC thus urged the federal government to rollback employee protections under the FMLA, including by "reform that will help crack down on the [alleged] abuse of FMLA time...."  Attached hereto and marked as Exhibit "A" is believed to be a true and correct copy of the above-described letter from SBC via Scott to the Office of Management and Budget.

12.     At first blush, the cost that SBC alleged it took to comply with the FMLA may seem quite significant.  But, from a relative point of view, it is not.  In the calendar year of Scott's letter (2001), SBC reported $7 billion dollars ($7,000,000,000.00) in annual earnings.  Thus, even if it cost SBC $50 million dollars ($50,000,000.00) a year in lost time and compliance costs (an amount above even SBC's estimate), this would mean that SBC spent a fraction of one percent (1%) of its annual earnings on compliance with this critically-important federal law

and its state law counterparts.  And, of course, SBC is a very large and sophisticated employer – thus, it should certainly be able to comply with a law that even much smaller businesses (those employing only fifty people within a seventy-five mile radius) are required to and do comply with.

13.     Ultimately, Congress declined SBC's invitation to rollback employee FMLA protections.  But, upon information and belief, after SBC's attempts to lobby Congress to rollback employee protections failed, Defendant AT&T hatched its own (unlawful) solution to the concerns articulated in Scott's letter – a policy, pattern and practice of retaliating against those who take FMLA or state law statutory family and medical leave or otherwise require reasonable accommodations (including time off) for medical or family care reasons with a particular focus on its California-based employees.

**2.     Defendant AT&T's decades-long history of a pattern and practice of FMLA retaliation.**

14.     Over the last decade-plus, Defendant AT&T has engaged in a comprehensive pattern and practice of unlawful "self-help" trying to make-up for SBC's failure to achieve its FMLA-related lobbying goals.  Over the last decade-plus, systemic discrimination and retaliation against those who take FMLA leave or otherwise require reasonable accommodations based on medical conditions or disabilities has become a standard operating procedure, an accepted way of doing business, and a deeply-embedded part of Defendant AT&T's corporate culture and this corporate culture has particularly affected its California-based operations (including the San Diego calls centers discussed below).  Indeed, retaliation and discrimination against employees who use family care and/or medical leave, or otherwise require reasonable accommodations (including time-off), has become so widespread and common at Defendant AT&T that it has been the subject of at least three separate class action lawsuits in California alone – all of which alleged

systemic violations of the FMLA and/or the California state law counterpart, the California Family Rights Act (CFRA).

15.  First, in June 2004, a California-based class action – entitled *Dudley, et al. v. SBC Communications, Inc., a Corporation; Pacific Bell Telephone Co., a Corporation, et al.*, bearing Los Angeles Superior Court Case No. BC 306226 – was filed alleging unlawful practices under California's CFRA (the state law equivalent to FMLA).  Among other things, the *Dudley* complaint alleged on a class-wide basis that individuals employed by Defendant AT&T were improperly denied requests for leaves of absence under the CFRA and were discriminated against based on their own disabilities.  Defendant AT&T resolved the *Dudley* matter on a class-wide basis including by payment of six million two hundred thousand dollars ($6,200,000.00) with the final judgment on the settlement entered in January 2006.  The settlement in the *Dudley* matter encompassed claims of nearly three thousand (3,000) current and/or former AT&T California-based employees.  It included Termination Classes and Suspension Classes, which were comprised of individuals who were terminated and/or suspended for attendance reasons and denied requests for CFRA and/or FMLA leave.  Attached hereto and marked as Exhibits "B" and "C" respectively are believed to be true and correct copies of the Order Granting Final Approval of Class Action Settlement and the Joint Stipulation of Settlement and Release in the *Dudley* matter.

16.  Second, in August 2011, another California-based class action lawsuit – entitled *Walsh, et al. v. Pacific Bell Telephone Co., et al.* and bearing Orange County Superior Court case number 30-2011-00498062-CU-OECXC – was filed against Defendant AT&T alleging systemic violation of family and medical leave laws.  The *Walsh* action alleged, inter alia, that Defendant AT&T regularly disciplined employees "customer service representatives" under its attendance policy for absences that were protected under the CFRA and/or California's Fair Employment and Housing Act's (FEHA) disability discrimination provisions, and

that it retaliated against employees for taking statutory medical leave.  The *Walsh* class included approximately four thousand two hundred and thirty-five (4,235) current and/or former employees of Defendant AT&T.  In or about May 2015, Defendant AT&T entered into a Stipulation and Agreement of Compromise and Settlement to settle the *Walsh* matter and preliminary approval of the class-wide settlement has been granted.  Under the proposed settlement, Defendant AT&T will pay as much as sixteen million eight hundred thousand dollars ($16,800,000.00) to settle the *Walsh* action.  Attached hereto and marked as Exhibits "D" & "E" respectively are the Third Amended Complaint and the Stipulation and Agreement of Compromise and Settlement in the *Walsh* matter.

17.    Third, also in August 2011, an FMLA class action – entitled *Beard, et al. v. Pacific Bell Telephone Company, a California Corporation, d/b/a AT&T California, et al.* and bearing United States District Court for the Northern District of California case number CV-11-3780-EDL – was filed against Defendant AT&T. The *Beard* action alleged, inter alia, that "AT&T ranks its employees by total absences each month" and that "AT&T calculates its employees' absences using a 'total absence policy' whereby all absences, including AT&T-designated FMLA-protected leave, are the basis for the rankings."  Moreover, the complaint alleged that "[w]hen AT&T determines that an employee is in the bottom 30% of its attendance records based on its monthly total absence calculations, its policy is to 'black list' the so-called 'FMLA abuser' and target the employee for termination. AT&T's policy is therefore to consider AT&T-designated FMLA-protected leave as a negative factor in its adverse employment decisions."  Attached hereto and marked as Exhibit "F" is believed to be a true and correct copy of the *Beard* Complaint.

18.    Upon information and belief, viewed strictly from the "dollars and cents" perspective through which Defendant AT&T sees the issue, Defendant AT&T's unlawful "self-help" made sense; ultimately, it has been profitable for

**COMPLAINT**

1  Defendant AT&T to break the law.  Upon information and belief, having failed to
2  convince the federal government to rollback FMLA protections, Defendant AT&T
3  chose as a matter of corporate policy to simply violate the protections of the
4  statutory medical leave and disability discrimination laws because, by doing so, it
5  could weed-out and get rid of those employees who took family or medical leave
6  resulting in a substantial cost savings to the company.  Upon information and belief,
7  the cost of doing so over the years has paled in comparison to the cost of complying
8  with the laws and this is precisely why Defendant AT&T chose as a matter of policy
9  to break the law rather than to follow it.

10       19.    The settlements in the *Dudley* and *Walsh* class action lawsuits illustrate
11  the point.  In settling these two class actions, Defendant AT&T obtained full release
12  of claims from over seven thousand two hundred and thirty-five (7,235) class
13  members covering approximately fifteen (15) years of class period.  In total, the
14  combined sum Defendant AT&T paid or will pay to resolve *Dudley* and *Walsh* was
15  twenty-three million dollars ($23,000,000.00) – a mere three thousand one hundred
16  and seventy-nine dollars ($3,179.00) per class member.

17       20.    Morever, while the combined sum payments in these two matters of
18  twenty-three million dollars ($23,000,000.00) may seem like a large amount in the
19  abstract, the settlement payments pale in comparison to SBC's estimated costs of
20  actually complying with and following the statutory medical leave laws.  During the
21  approximately fifteen (15) years of class period covered by the *Dudley* and *Walsh*
22  cases, the lost salary alone as a result of FMLA use according to SBC's calculations
23  would have been approximately six hundred million dollars ($600,000,000.00) ($40
24  million per year x fifteen years).  And this figure understates the true cost to
25  Defendant AT&T because it does not even factor in administrative and compliance
26  costs.

27       21.    In short, and upon information and belief, Defendant AT&T
28  determined that it costs less to break the law than to follow the law.  It therefore

- 9 -
**COMPLAINT**

created a policy and practice of violating the statutory leave and disability laws with impunity as a profit-making, cost-cutting measure. The decision to adopt such a policy and/or practice stems from Defendant AT&T's corporate culture that encourages and fosters discrimination and retaliation against those who take medical or family care leave or need time off as an accommodation. This corporate culture spreads down the corporate ladder and affects decision-making at local levels – including particularly in California and the San Diego call centers discussed herein specifically.

**3.      Defendant AT&T revamps its Western Region attendance and disciplinary policies for the purpose of making it easier to retaliate against those who take FMLA/CFRA leave or otherwise require time off for medical or family care reasons.**

22.      In November 2009, as part of its corporate scheme to punish and retaliate against those who took FMLA/CFRA leave or otherwise required time off for medical or family care reasons, Defendant AT&T implemented a new West Region attendance policy. The previous attendance policy provided objective criteria to measure an employee's attendance record. Under the old policy, a certain number of unprotected absences within a certain amount of time would lead to a specified level of progressive discipline. Then, a certain number of additional unprotected absences within a certain amount of additional time would lead to the next specified level of progressive discipline. Under the old policy, the attendance-based disciplinary decision-making was thus objective – management was not given wide discretionary judgment or the opportunity to abuse their power to target certain vulnerable classes (such as those who regularly need to use FMLA time).

23.      However, in November 2009, Defendant AT&T implemented a new attendance in its West Region (California and Nevada). This new attendance policy removed the objective criteria used under the old policy to measure attendance and replaced it with much more subjective criteria to measure attendance. According to

**COMPLAINT**

upper management, the new policy was implemented at least in part because it would make it easier for management to target those who took FMLA for attendance-based discipline and, eventually, termination.  Indeed, management expressly stated that the new policy was intended to help crack down on alleged "FMLA abuse" – a phrase that within Defendant AT&T is and was synonymous with frequent "FMLA use" (including legitimate, medically-necessary use).

24.    Defendant AT&T made other policy changes within the West Region to further its family or medical leave retaliation scheme.  In 2009 or 2010, Defendant AT&T revamped its West Region performance-related disciplinary system by creating a so-called "will versus skill" performance management system. A core component of this new performance management system was the concept that supervisors or managers were to determine if the alleged performance issues were matters of "skill" – that is, the employee lacked certain skill, knowledge, etc. so required additional training and assistance – versus a matter of "will" – that is, the employee knew how to do the job but was allegedly "choosing" not to perform satisfactorily.  This "will versus skill" distinction was, by design, entirely subjective when applied to the customer service position because so much of the customer service job was subjective, judgment-call type work given its customer service focus.

25.    With the combination of subjective performance criteria and subjective attendance standards, Defendant AT&T created a system by which its managers and supervisors could (and were encouraged to) target so-called "FMLA abusers" under the guise of performance- or attendance-management.  And that is precisely what Defendant AT&T did – including with particular vigor in California (including, but not limited to, at its San Diego bilingual call centers).

**COMPLAINT**

**4.      The San Diego Call Centers' rampant FMLA retaliation.**

26.      Defendant AT&T has maintained bilingual call-centers in San Diego, California.  The call-centers employ many customer service representatives (CSRs) who report to a first level supervisor who in turn reports to a second level supervisor who in turn reports to the General Manager.  Defendant AT&T's San Diego bilingual call-centers have operated consistent, and in full accordance with, the company's overall policy, pattern and practice of rampant retaliation against those who take statutory medical leave and/or require disability accommodations (including time off from work).

27.      For years, Emily Cordoba was the General Manager in charge of the San Diego bilingual call-centers.  Cordoba was open and notorious in her disdain for family or medical leave users and she demanded that the managers and supervisors who worked under her (such as Plaintiff Mark Gefrom) retaliate against those who took FMLA leave.  Among other things, and by way of example and not limitation:

● Cordoba made it clear to her management team that she did not approve of, and was not okay with, CSRs missing work because they were taking medical or family care leave.  Cordoba made it quite apparent that her assumption was that any person using FMLA was abusing it or using it unnecessarily.  In Cordoba's words, "How can they be a good employee if they are not at work?"

● Cordoba frequently asked attendance managers (supervisors who specifically track CSR attendance) to gather as much information as possible about the underlying illness that led to the use of FMLA time so that management could try to find gaps in the CSR's explanation for the need for leave or so that the company could obtain justification for surveillance of the CSR while on leave.

● Cordoba held regular "Worst Case Calls," which were regular conference calls involving Cordoba, the attendance manager and other managers and supervisors at which time the "worst case" attendance employees were discussed.  At these regular "Worst Case Calls," Cordoba and management would identify "worst cases" CSRs, which were those CSRs whom upper management alleged had been away from work too often – including because of protected FMLA leave.  During these "worst case" calls, Cordoba demanded that those who took FMLA – pejoratively called "FMLAers" by management – be disciplined through scrutinizing and micro-managing their performance.  Cordoba specifically directed that managers or supervisors should excessively monitor the calls handled by the "FMLAers" in an attempt to find justifications for disciplining the "FMLAers."

● Cordoba referred to the process of targeting "FMLAers" for performance attacks as "cutting the fat," and she stated that FMLA leave was "like a virus" that had spread throughout the San Diego office.

● As part of the process of managing and supervising CSRs, the assigned supervisor could listen to a certain number of calls for a particular CSR in a given month.  Cordoba instructed the supervisors that they should score one to two (1-2) calls per month for whom she considered the high performers, three to four (3-4) calls per month for whom she considered the medium performers and five to six (5-6) calls per month on whom she considered the low performers.  Typically, the alleged "low performers" were the individuals considered by Cordoba to be "FMLAers."  The more calls a CSR was scored on, the more opportunity for the manager to find flaws in the CSR's performance.

● Cordoba also instructed supervisor to conduct separate sessions of call monitoring of "FMLAers" during the same month.  By doing this, the alleged "FMLAer" may believe his or her monitoring sessions are completed for the

month after the initial session and, therefore, may be more lax in performing the rest of the month (thus creating opportunity for management to catch an "FMLAer" making an error, skipping a step in the process, etc.).

● Cordoba regularly told her managers and supervisors that "there is no such thing as a perfect call" so that managers or supervisors should be able to find errors, mistakes or lapses committed by the "FMLAers" when monitoring their calls.

28.    As General Manager of the call-centers, Cordoba set the tone and made her retaliatory and discriminatory expectations clear, and she expected and demanded that managers and supervisors beneath her carry-out her orders by finding ways to justify disciplining and terminating so-called "FMLAers."  In at least some instances, Cordoba even sought out and hired managers or supervisors who were known for "cleaning house" – such as Yamilka Acosta whom Cordoba recruited from Texas to manage part of the San Diego call-center.  Acosta, like Cordoba, was disdainful of those who took FMLA and was an active part of implementing the FMLA retaliation scheme at the San Diego call-center.

29.    Over the years, numerous complaints were made at and about the San Diego call centers' clear pattern of retaliating and discriminating against those who took FMLA or other leave, and numerous lawsuits have been filed to date alleging rampant and widespread FMLA retaliation and discrimination based on medical conditions arising out of the San Diego call-centers.

**B.    After nearly fifteen (15) years of faithful, loyal service, Defendant AT&T terminates Plaintiff Mark Gefrom because he opposed and refused to participate in Defendant AT&T's family and medical leave retaliation scheme.**

**1.    Mark Gefrom's nearly fifteen (15) year employment with Defendant AT&T.**

30.    In 1999, Plaintiff Mark Gefrom began working for Defendant AT&T as a bilingual CSR.  In 2006, Mr. Gefrom was promoted to a supervisor in the

bilingual call-center then located at Sequence Drive in San Diego, California.  As a supervisor, he managed a team of bilingual CSRs working at the call center.

31.     Over the years, Mr. Gefrom's work performance met and exceeded standards, and he received various recognitions in the form of positive performance evaluations, raises and eventually the promotion to the supervisor position.

**2.    Mr. Gefrom's opposition to, and refusal to engage in, Defendant AT&T's unlawful retaliation and discrimination scheme.**

32.     Mr. Gefrom resisted and opposed attempts by Cordoba or his direct manager to push him into disciplining harshly or unfairly certain CSRs who were designated by Cordoba or his direct manager as "FMLAers."  Mr. Gefrom explained that, while the employee being targeted did take FMLA, the employee nonetheless was a good worker.  Cordoba's typical response was: "How can they be a good worker if they aren't at work?"  Mr. Gefrom was then dismissed as being naive or too protective of the alleged "FMLAer."

33.     At times when Mr. Gefrom refused to target for discipline an "FMLAer" – instead explaining to Cordoba or his direct manager that the alleged "FMLAer" was a good, productive worker despite his or her use of FMLA or other time off – Cordoba responded by impliedly threatening Mr. Gefrom: "So would you [Gefrom] mind if I [Cordoba] go and listen to the calls you've monitored to see how you've scored them?"  The implication of Cordoba's threat was clear: if he did not discipline the alleged "FMLAer" as she demanded, then Cordoba would turn the tables on Mr. Gefrom by monitoring his monitoring of the CSRs so that she could find bogus, unjustified ways to manufacture performance attacks against Mr. Gefrom.

34.     In approximately the summer of 2013, Yamilka Acosta began working as a second-level supervisor at the San Diego bilingual call center and Mr. Gefrom began reporting directly to Acosta (with Cordoba still the General Manager and Mr.

Gefrom's second-level supervisor).  As alluded to above, Cordoba specifically recruited Acosta to come to the San Diego call center to "clean house" as Acosta had reportedly done at a Texas call center where Acosta had previously worked and of which Cordoba was also the General Manager in charge.

35.    Immediately upon her arrival in San Diego, it was apparent that Acosta had disdain for those who took FMLA or otherwise missed work, and she quickly began to fulfill Cordoba's mandate that management target those who took FMLA.

36.    In or about August 2013, Acosta began to target for discipline certain CSRs she categorized as "FMLAers," including some CSRs who were on Mr. Gefrom's team.  Acosta routinely instructed Mr. Gefrom to review the results of specific "FMLAers" with the goal of finding certain justifications to discipline them.  If he did not see a legitimate justification for disciplining the alleged "FMLAer," Mr. Gefrom resisted, delayed and/or did not do so because it was clear to him that these were simply attempts to retaliate against CSRs for taking FMLA or other medical leave.

37.    After Mr. Gefrom refused Acosta's instructions by avoiding or delaying what he believed was Acosta's attempt to target an "FMLAer" with an unjustified performance attack, Acosta took over the process of investigating these alleged "FMLAers'" performance or conduct and eventually she manufactured the alleged justification for termination or discipline.  While the normal process was that the direct supervisor would conduct formal investigations of his or her own direct reports, in this instance Acosta pushed Mr. Gefrom out of the way, conducted the inquiry into the alleged "FMLAers" herself and, in the process, turned the investigation around and directed it at Mr. Gefrom.  Together, Acosta and Cordoba then trumped-up bogus, false performance attacks on Mr. Gefrom alleging that he failed to perform his job duties in supervising and managing his employees and committing a "Code of Conduct" violation.

38.     On September 19, 2013, Defendant AT&T terminated Mr. Gefrom's employment on the basis of these false and pretextual performance attacks.  The real reason for the termination was simple: Mr. Gefrom opposed and refused to participate in the ongoing scheme to retaliate and discriminate against those who took time off for medical or family care reasons.

**FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR**
**VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT**
(29 U.S.C. § 2615)

39.     Plaintiff hereby repeats, realleges, and incorporates by this reference each and every allegation from each and every paragraph before and after this paragraph as though said paragraphs were set forth in full herein.

40.     At all times herein mentioned, Defendants were "employers" under the Family and Medical Leave Act and, specifically, 29 U.S.C. section 2611(4).

41.     At all times herein mentioned, Plaintiff was an "eligible employee" under the Family and Medical Leave Act and, specifically, 29 U.S.C. section 2611(2).  Moreover, Defendants employed thousands of other "eligible employees" under 29 U.S.C. section 2611(2).

42.     FMLA regulations provide that "[a]n employer is prohibited from interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the Act."  29 C.F.R. §825.220(a)(1).  FMLA regulations further provide that "[a]n employer is prohibited from discharging or in any other way discriminating against any person (whether or not an employee) for opposing or complaining about any unlawful practice under the Act."

43.     As detailed above, Plaintiff engaged in opposition activity protected by the FMLA when he opposed retaliation against those who took FMLA.

44.     Defendants retaliated against Plaintiff for such conduct (including by terminating his employment).

45.     As a result of the foregoing, Plaintiff has suffered economic damages and/or monetary losses and, under 29 U.S.C. section 2617(a)(A)(ii) is entitled to interest on such economic damages or monetary losses.

46.     Moreover, Plaintiff is informed and believes and thereupon alleges that the violation of his rights under the FMLA was a "willful" and, thus, under 29 U.S.C. section 2617(a)(A)(iii) Plaintiff seeks "an additional amount as liquidated damages equal to the sum" of his economic damages, monetary losses and interest thereon.

47.     Plaintiff has been forced to and will incur attorney's fees and statutory costs in the prosecution of this claim, in an amount to be proved at trial, which Plaintiff seeks recovery of under 29 U.S.C. section 2617(a)(3).

**SECOND CLAIM FOR RELIEF AGAINST PACIFIC BELL TELEPHONE COMPANY, A CALIFORNIA CORPORATION, DOING BUSINESS AS AT&T COMMUNICATIONS OF CALIFORNIA, INC. FOR WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

48.     Plaintiff hereby repeats, realleges, and incorporates by this reference each and every allegation from each and every paragraph before and after this paragraph as though said paragraphs were set forth in full herein.

49.     California law prohibits termination or other adverse employment actions against employees for reasons that violate public policy.  Plaintiff is informed and believes and thereon alleges that Defendants violated public policy by terminating his employment for opposing practices that Defendants engaged in which violated California's public policy and as a result of his refusal to engage in unlawful behavior.

50.     Defendants' unlawful conduct that Plaintiff opposed, reported and/or refused to participate in included violations of, *inter alia* and merely by way of

example and not limitation: (a) the Family & Medical Leave Act [29 U.S.C. §2601, et seq.]; (b) the California Family Rights Act [California Government Code §12945.2, et seq.]; (c) the California Fair Employment and Housing Act, including its anti-retaliation provisions and its provisions prohibiting disability discrimination, requiring provision of reasonable accommodations and requiring a good-faith interactive process [Government Code §§12940(a), (h), (m) & (n)]; and (d) the Americans with Disabilities Act [42 U.S.C. §§12101, et seq.]. These laws, statutes and their interpretative regulations inure to the benefit of the public at large, and embody fundamental public policy of the State of California and the United States.

51. As a direct and proximate result of Defendants' conduct in violation of public policy, Plaintiff has sustained and continues to sustain substantial losses in past, present and future earnings, bonuses and other employment benefits in an amount to be proven at trial, which are in excess of the Court's minimum jurisdictional limits.

52. As a proximate result of Defendants' wrongful termination of Plaintiff, he has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damage in a sum to be established according to proof.

53. As a result of Defendants' deliberate, outrageous, malicious and despicable conduct as alleged herein, Plaintiff is entitled to an award of punitive and exemplary damages in an amount sufficient to punish and to deter such wrongdoing. Defendants' malicious, oppressive and/or fraudulent conduct was committed by, authorized by or ratified by its officers, directors and/or managing agents.

**COMPLAINT**

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as follows:

**On the First Claim for Relief:**

1.     For lost wages, benefits, and other compensation or other economic damages lost as a result of the violation;

2.     For other direct economic losses;

3.     For interest on the economic losses;

4.     For liquidated damages in an additional amount equal to the entire award of other damages;

5.     For attorney's fees and costs of suit; and

6.     For such other and further relief as the Court deems just and proper, including declaratory and/or injunctive relief if appropriate on the statutory claims.

**On the Second Claim for Relief:**

1.     For general and special damages according to proof;

2.     For pre-judgment interest to the extent allowed by law;

3.     For costs of suit incurred herein;

4.     For punitive and/or exemplary damages in an amount to punish Defendants; and

5.     For such other and further relief as the Court deems just and proper, including declaratory and/or injunctive relief if appropriate on the statutory claims.

Dated: September 17, 2015     **The deRubertis Law Firm, APC**

**Law Office of David P. Strauss**

**The Law Office of Terry J. Chapko**

By  *s/David M. deRubertis*
     David M. deRubertis
     Alyssa K. Schabloski
     Attorneys for Plaintiff Mark G. Gefrom

- 20 -
**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all issues so triable in the Complaint, or any other pleading filed in this matter.

Dated: September 17, 2015     **The deRubertis Law Firm, APC**

**Law Office of David P. Strauss**

**The Law Office of Terry J. Chapko**

By _s/David M. deRubertis_
David M. deRubertis
Alyssa K. Schabloski
Attorneys for Plaintiff
Mark G. Gefrom

**COMPLAINT**